UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                    :
  TODD DUFFEY,                                                      :
                                                                    :
                              Plaintiff,                            :
                                                                    :     13 Civ. 1354 (JPO)
                     -v-                                            :
                                                                    :     OPINION AND ORDER
  TWENTIETH CENTURY FOX FILM                                        :
  CORPORATION; LIBRARY PUBLICATIONS, INC.,                          :
                                                                    :
                              Defendants.                           :
                                                                    :
-------------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      This is a case about the sale of merchandise relating to the movie *Office Space*, a 1999 cult classic about the soul-crushing experience of working under incompetent management. The merchandise at issue is the *Office Space* "Box of Flair," a product that was sold to consumers beginning in 2007. "Flair" refers to buttons that waiters in the film must wear as a mode of corporate-mandated self-expression. The front of the Box of Flair includes an image of a waiter in the film who wholeheartedly embraces these buttons as a means to express himself. The actor who played that character, Plaintiff Todd Duffey, claims that this use of his image is unauthorized and is likely to mislead consumers into believing that Duffey is personally affiliated with the *Office Space* Box of Flair. Defendants move to dismiss this case for failure to state a claim. For the reasons that follow, Defendants' motion is granted.

**I.     Background**

      Duffey alleges the following background facts in the operative complaint. The court accepts these facts as true for the purposes of this motion. *Michael Coppel Promotions Pty. Ltd. v. Michael Bolton*, 982 F. Supp. 950, 953 (S.D.N.Y. 1997). This summary of the facts also

references two contracts and the Box of Flair itself, all of which are integral to the operative complaint.[1]

In 1998, Duffey, a resident of Texas, agreed to portray the character "Chotchkie's Waiter" in *Office Space*. Duffey's scenes were filmed in Texas. The terms of his employment were memorialized in a one-page Day Player Agreement with Cubicle, Inc., the production company behind *Office Space*. (Zavin Decl. Ex. H (Day Player Agreement), Dkt. No. 10-8.) The Day Player Agreement granted Cubicle "all rights throughout the universe" to Duffey's performance, including the right to use pictures from his performance for commercial purposes

---

[1] There are two contracts at issue in this case: a "Day Player Agreement" between Duffey and Cubicle, and the "SAG Agreement," a collective bargaining agreement between the Screen Actors Guild and the Alliance of Motion Picture & Television Producers. Duffey did not attach the Day Player Agreement, the SAG Agreement, or images of the Box of Flair itself to the operative complaint. Because a motion under Rule 12(b)(6) tests the sufficiency of the pleading, courts generally should not rely on material outside the pleading to decide the motion. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). But if a pleading relies heavily on the terms and effect of a document, that document is "integral" to the pleading, and the court may consider it. *Id.* at 156–57. This rule prevents plaintiffs from surviving 12(b)(6) motions because of "clever drafting" alone, where "the incorporated material is a contract . . . containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Id.* at 157. It is clear that Duffey's claim relies heavily on the terms of the Day Player Agreement and the SAG Agreement: his first claim for relief seeks a declaration about the meaning of these agreements. His claims also rely heavily on the appearance of the Box of Flair itself. Duffey could not argue that he lacked notice or a chance to respond to these matters—Defendants attached both agreements and a Box of Flair to their motions to dismiss, and Duffey discussed these exhibits in his opposition. The Court therefore considers the Day Player Agreement, the SAG Agreement, and the Box of Flair to be integral to the complaint.

in connection with his performance. [2]  *Id.*  The Day Player Agreement also specified that Duffey's employment would be in accordance with a schedule appended to a collective bargaining agreement between the Screen Actors Guild and Cubicle ("SAG Agreement").  The schedule details specific conditions of employment for "day performers," such as a minimum wage, mandatory rest periods, meal periods, and miscellaneous duties for which a performer is entitled to reimbursement.  (Zavin Decl. Ex. J-2 (Schedule), Dkt. No. 10-11.)

Cubicle subsequently conveyed its interest in *Office Space* to Defendant Twentieth Century Fox Film Corporation.[3]  Fox released *Office Space* in February 1999; about eight years later, Fox granted Defendant Library Publications, Inc. (doing business as "Running Press") a license to use images of Duffey's performance on consumer merchandise.  Running Press began selling the Box of Flair in 2007.

---

[2] The Day Player Agreement reads in relevant part: "[Duffey] hereby grants to [Cubicle], its successors and assigns forever, all rights throughout the universe in and/or to all results and proceeds of [Duffey's] services rendered hereunder, including but not limited to, the rights to [] use . . . in any manner . . . whatsoever now known or hereafter devised in perpetuity, any pictures, likeness or representations made hereunder, of [Duffey], including but not limited to . . . the right to  . . . display [Duffey's] . . . likeness for commercial . . . purposes in connection therewith."

[3] Duffey failed to allege this fact in the operative complaint, but Defendants correctly observe that the Court may take judicial notice of documents recorded with the United States Copyright Office.  *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (holding that district court may take judicial notice of federal copyright registrations published in the Copyright Office's registry); *Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000) (holding that district court may take judicial notice of facts when deciding a motion to dismiss), *abrogated on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  Documents recorded with the Copyright Office establish that Cubicle assigned its interest in *Office Space* to Fox on February 11, 1999.  (Zavin Decl. Ex. I (Certificate of Recordation), Dkt. No. 10-9.)

The Box of Flair contains fifteen pieces of flair,[4] one of which features an image of Duffey performing as Chotchkie's Waiter. Duffey is wearing a Chotchkie's uniform and thirty-seven pieces of flair, enthusiastically pointing off-camera with both hands. The box also includes a booklet describing each piece of flair. The description of the piece of flair featuring Duffey's image states that "Brian is the über-cheerful waiter at Chotchkie's who has no problem expressing himself," and suggests that wearing this piece of flair is appropriate if you wish to communicate that "[y]ou have been completely brainwashed by the work training video." The exterior of the Box of Flair itself is covered with a collage of the pieces of flair. The piece of flair with Duffey's image is featured most prominently in the upper-left-hand corner of the front face of the box, next to the title "The Office Space Box of Flair."



---

[4] Fifteen pieces of flair is the bare minimum of flair Chotchkie's waiters may wear to express themselves. (Zavin Decl. Ex. A (DVD of *Office Space* Film), Dkt. No. 10-1.)

Duffey learned about the Box of Flair in 2010.  Three years later, in January 2013, he requested that Running Press provide him with an accounting of Box of Flair sales.  After Running Press refused, Duffey filed this action in February 2013.  He claims that the use of his photograph on the Box of Flair constitutes false endorsement under the Lanham Act, 15 U.S.C. § 1125(a).  *Cf. Swingline, Inc. v. Staple Ctr. Mfg. Corp.*, No. 86 Civ. 7878, 1989 WL 24115 (N.D. Ill. Mar. 13, 1989) (finding prominent use of Swingline mark on competitor's staple packages likely to deceive consumers).  In the alternative, Duffey claims that Defendants have breached the SAG Agreement.  He seeks (1) money damages; (2) a permanent injunction (a) directing Defendants to destroy any merchandise featuring his photograph and (b) prohibiting Defendants and any party acting in concert with Defendants from using his photograph on consumer merchandise; and (3) a declaratory judgment that his claims are not subject to the SAG Agreement.  Defendants have moved to dismiss the complaint for failure to state a claim.

**II.     Discussion**

    **A.     Legal Standard**

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to make a short, plain statement showing that the pleader is entitled to relief.  A complaint states a claim for relief if the claim is plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To review a complaint for plausibility, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the pleader's favor.  *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 555).  But the court need not accept "[t]hreadbare recitals of the elements of a cause of action," which are essentially legal conclusions.  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).  After separating legal conclusions

from well-pleaded factual allegations, the court must determine whether those facts make it plausible—not merely possible—that the pleader is entitled to relief. *Id.*

### B.      Rights Granted to Cubicle in Day Player Agreement

The potentially dispositive issue common to each of Duffey's claims is whether he has given up his right to pursue them.  Two provisions of the Day Player Agreement bear on this question.  In the first provision, Cubicle agrees to employ Duffey in accordance with the terms set forth in a schedule attached to the SAG Agreement.  In the second provision, Duffey grants Cubicle "all rights throughout the universe" to his performance.  The first provision has generated confusion over whether federal or state law controls interpretation of this contract.

#### 1.      Law Governing Interpretation of Day Player Agreement

##### a.      Application of Labor Management Relations Act

Because the first provision references a collective bargaining agreement, Defendants contend that Duffey's breach of contract claims are preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a).  Section 301 grants district courts subject matter jurisdiction over suits for violation of collective bargaining agreements.  The Supreme Court has held that Congress passed § 301 with the intent that district courts would create a body of federal common law, resulting in relatively uniform interpretation of labor contracts throughout the country.  *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957).  To achieve that goal, § 301 preempts state law claims that are "substantially dependent" on analysis of the terms of a collective bargaining agreement.  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).

Defendants argue that Duffey's claims for breach of contract are substantially dependent on analysis of the terms of the SAG Agreement.[5]

"[N]ot every dispute that touches upon a collective bargaining agreement is preempted by § 301." *Williams v. Comcast Cablevision of New Haven, Inc.*, 322 F. Supp. 2d 177, 182 (D. Conn. 2004) (citing *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994)).  Section 301 applies only if Duffey's claims substantially depend on interpretation of a collective bargaining agreement.  They do not.

The Day Player Agreement itself is not a collective bargaining agreement.  It is a contract between Duffey and Cubicle, not a contract between a union and an employer.

---

[5] Duffey's response to this argument is confusing.  He initially pleads a legal conclusion that the Day Player Agreement is subject to the terms of the SAG Agreement.  Later, in response to Defendants' argument, Duffey claims that "there is a fundamental question" whether he is subject to the SAG Agreement because he was not a SAG member at the time he signed the Day Player Agreement and filmed his scenes for *Office Space*. (Pl.'s Opp. at 16, Dkt. No. 14.)  This fact is not alleged in the operative complaint.  Duffey also observes that Texas is a right-to-work state.  He purports to establish this point of law by citing his own declaration in which he asserts that he performed under the Day Player Agreement in Texas, which is "considered" to be a right-to-work state; therefore, he was not required to join SAG as a condition of his employment. (Duffey Decl. ¶ 9, Dkt. No. 15.)  The opposition brief does not cite any legal authority on this matter.

Next, Duffey block-quotes a clause permitting Cubicle to employ performers only if they are SAG members in good standing.  The quoted provision is a union security clause.  Such provisions require new employees to become members of a union shortly after they are hired. *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 37 (1998).  Compounding the mystery surrounding this lonely block quote: Duffey specifically noted that Texas is a right-to-work state.  If this claim has any relevance to Duffey's case, it is to suggest that Texas law governed whether Cubicle was required to fire Duffey if he refused to join SAG—right-to-work states such as Texas do not enforce union security clauses such as the one Duffey quotes here. *Oil, Chem. & Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 409–10 & n.1 (1976).

Finally, Duffey claims that a different provision, paragraph 2(c), "makes it clear" that only the minimum salary and working conditions provisions in the SAG Agreement apply to nonmembers. (Pl.'s Opp. at 17.)  Contrary to counsel's representation, paragraph 2(c) does not specify what provisions of the SAG Agreement apply to performers who are not SAG members. (Newman Decl. Ex. C at 3 (Excerpt of SAG Agreement), Dkt. No. 16-3.)

The SAG Agreement is a collective bargaining agreement, but Duffey's claims do not depend on its interpretation. Duffey is not bound by its terms. Defendants argue that Duffey is bound by the SAG Agreement because it purports to incorporate itself into the individual contract of employment between each performer and Cubicle. This position is unpersuasive for two reasons. First, Cubicle is not a party to the SAG Agreement: the agreement is between SAG and members of the Alliance of Motion Picture & Television Producers, each of which is listed in Exhibit A to the SAG Agreement. Cubicle is not listed as a member. Second, Duffey cannot be bound to a contract to which he did not agree. Duffey agreed to the terms of the Day Player Agreement, but not the terms of the SAG Agreement. The parties do not argue that SAG negotiated the collective bargaining agreement as Duffey's agent, nor that Duffey later bound himself to the terms of the agreement by ratification. While Defendants are correct that Fox recognizes SAG as the exclusive collective bargaining agent for all performers in Fox films, Duffey never entered into a contract with Fox. He entered into a contract with Cubicle. Cubicle could not unilaterally bind Duffey to the terms of the SAG Agreement by selling Duffey's performance to Fox. In short, the well-pleaded factual allegations do not establish that Duffey agreed to be bound by the SAG Agreement.

Finally, the schedule arguably could be a collective bargaining agreement for purposes of § 301—it was negotiated between a union and an employer, but then incorporated by reference into a private contract—but the Court need not resolve this point. None of Duffey's claims depends on provisions in the schedule. The schedule does not contain the arbitration provisions or separate negotiation requirements to which both parties refer in their briefs. Therefore, even if the schedule were a collective bargaining agreement for purposes of § 301, § 301 still would not apply. *See Adonna v. Sargent Mfg. Co.*, 485 Fed. App'x 445, 447 (2d Cir. 2012) (quoting

*Livadas*, 512 U.S. at 123) ("[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."). Because none of Duffey's claims is substantially dependent on analysis of a collective bargaining agreement, federal law does not apply to interpretation of the contracts at issue.

### b. Choice of Law

The Day Player Agreement does not contain a choice of law provision. To interpret the Day Player Agreement, the Court must determine what body of law governs its terms. The first question is whether federal or state choice of law principles apply. It is not dispositive that this action was brought pursuant to federal question jurisdiction. The source of the right asserted—not the basis for subject matter jurisdiction—determines whether state or federal law governs any given issue in federal litigation. *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 475–76 (1967) (Harlan, J., dissenting) ("[T]he [Rules of Decision] Act gives [state law] force in federal courts, *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); it is not, for that purpose, material whether [] jurisdiction . . . is founded upon diversity of citizenship."); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n.1 (2d Cir. 1956); Wright & Miller, Fed. Prac. & Proc. Juris. 2d § 4520.

If a defendant asserts that the plaintiff agreed to forego the right to bring the claims he has filed, the defendant seeks to enforce contractual rights, which are interpreted in accordance with state law in the absence of a "distinctive national policy" to the contrary. *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 153 (2d Cir. 1968) (Friendly, J.) ("The development of a federal common law of contracts is justified only when required by a distinctive national policy . . . .") (quotation marks omitted); *see, e.g.*, *Rooney v. Columbia Pictures Inds., Inc.*, 538 F.

Supp. 211, 223 n.4 (S.D.N.Y.) (applying state choice of law rules to interpret contract where defendant claimed plaintiff had granted defendant his right to bring various federal claims, including Lanham Act claims), *aff'd*, 714 F.2d 117 (2d Cir. 1982).  The Day Player Agreement implicates no such distinctive national policy, and therefore, state law governs its interpretation.  *Cf. Bartsch*, 391 F.2d at 153–54 (holding, where defendant asserted that plaintiff had contractually waived copyright claims: "A threshold issue . . . is whether this question should be determined under state or federal law. . . . New York law governs. . . . [T]he general interest that copyrights . . . should be enjoyed by their true owner is not enough to [require application of federal common law].  The fact that plaintiff is seeking a remedy granted by Congress . . . removes any problem of federal jurisdiction but does not mean that federal principles must govern the disposition of every aspect of her claim.").

Federal courts faced with state law claims must apply choice-of-law principles of the state in which they sit.  *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4 (1975) (*per curiam*) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)).  The New York choice-of-law analysis begins by asking whether there is an actual conflict between the different bodies of law that might apply.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006)).

New York applies a "center of gravity" approach to choosing which law to apply in contract cases.  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997) (citing *Babcock v. Jackson*, 12 N.Y.2d 473, 481–82 (1963)).  To find the center of gravity for a particular contract, courts consider the significance of various contacts with the relevant jurisdictions, including where the contract was drafted, negotiated, executed, and performed; the location of the subject matter; and the domicile or place of business of the contracting parties.

*Id.* (citing *In re Allstate Ins. Co. & Stolarz*, 81 N.Y.2d 219, 227 (1993)).  The jurisdictions relevant to this action are Texas, where the contract was negotiated, executed, and performed; and California, where Duffey may be domiciled.[6]

For the purposes of this case, there is an actual conflict between Texas and California law.  Duffey asks the Court to consider evidence extrinsic to the Day Player Agreement.  Both Texas and California prohibit courts from relying on extrinsic evidence to supplement the terms of an otherwise unambiguous contract.  *See F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010) (quoting *Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Cal. App. 4th 1992)); *Addicks Svcs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010) (quoting *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006)).  But California follows a two-step approach to extrinsic evidence: even if a contract is clear on its face, courts provisionally receive extrinsic evidence to determine whether the contract is ambiguous in light of that evidence.  *F.B.T. Prods.*, 621 F.3d at 963 (quoting *Winet*, 6 Cal. Rptr. 2d at 557); *California v. Aerojet Gen. Corp.*, 13 Fed. App'x 639, 641–42 (9th Cir. 2001) (citing *Barris Indus. v. Worldvision Enters.*, 875 F.2d 1446, 1446 (9th Cir. 1989)) ("[C]ourts must consider extrinsic evidence to determine whether the contract is ambiguous even if the contract appears clear on its face.").  In Texas, however, "[c]ourts interpreting unambiguous contracts are confined to the four corners of the

---

[6] The operative complaint alleges that Duffey resides in California, and the parties' briefs do not address his domicile because they do not engage in the New York choice of law analysis.  Duffey's arguments apply both New York and Texas law to interpret the agreement.  Defendants assert, without elaboration, that only New York or California law could govern.  These positions are both incorrect: as discussed above, Texas law could govern, as could the law of any jurisdiction where Cubicle has or had a place of business.  But there is no possibility that New York law could govern.  New York is not implicated by any of the "center of gravity" considerations—Fox has a place of business in New York, but Fox was not a party to the Day Player Agreement.  Because the parties do not suggest that jurisdictions other than California and Texas are relevant, the Court considers only those jurisdictions here.

document, and cannot look to extrinsic evidence to create an ambiguity." *Addicks Svcs.*, 596 F.3d at 294 (quoting *Am. Tobacco Co.*, 463 F.3d at 407).  This conflict requires a choice between Texas and California law.

Texas is clearly the center of gravity in the dispute over the Day Player Agreement.  The contract was negotiated, executed, and performed in Texas, and Duffey was residing in Texas when he filmed his scenes for *Office Space* (it is unclear whether he was domiciled in Texas).  The parties have not suggested that Cubicle had a place of business in California or that the agreement was drafted in California.  Duffey moved to California after *Office Space* had been filmed—it is not clear whether he is now domiciled there, but even if he were, Texas would remain the jurisdiction with more significant contacts to this dispute.  Texas law therefore governs interpretation of the Day Player Agreement.

    2.  **Interpretation of the Day Player Agreement**

Duffey agrees that the Day Player Agreement is a valid contract granting Cubicle broad rights to his performance.  He does not contest that Cubicle subsequently sold those rights to Fox, and that Fox in turn sold Running Press a license to use images from Duffey's performance on the Box of Flair.  But Duffey does dispute that the rights he granted to Cubicle included the right to use images of his performance in connection with consumer merchandise.  He argues that his contract must be interpreted in light of industry custom, which requires a specific merchandising provision in order to grant merchandising rights.

Contract terms are construed with the primary aim of ascertaining the intent of the parties as expressed in the contract, known as their "objective intent." *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)); *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) (quoting *City of Pinehurst v.*

*Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)) ("[I]t is objective, not subjective, intent that controls."). Courts must interpret unambiguous contract language as a matter of law. *Grohman*, 318 S.W.3d at 887 (citing *Univ. Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003)); *cf. Intech, Inc. v. Consol. Freightways, Inc.*, 836 F.2d 672, 674 (1st Cir. 1987). To determine whether a contract is ambiguous, the court must consider the contract as a whole and the circumstances present at the time the parties entered the contract. *AEP Energy Svcs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 728 (2d Cir. 2010) (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)); *Sun Oil Co.*, 626 S.W.2d at 731; *cf. T.G.I. Friday's Inc. v. Nat'l Restaurants Mgmt., Inc.*, 59 F.3d 368, 373 (2d Cir. 1995). But the court may not consider extrinsic evidence. *Sun Oil Co.*, 626 S.W.2d at 731–32.

The difference between circumstances surrounding the contract's execution (which a court must consider to determine ambiguity) and extrinsic evidence (which a court may not consider) is defined in a footnote to *Sun Oil Co.*, the leading Texas Supreme Court case discussing the issue. To determine whether a contract is ambiguous, a court must consider "the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean." *Id.* at 731 n.5 (quoting Restatement of Contracts § 230 (1932)). The note goes on to clarify that "courts do not confine themselves to a mere inspection of the document. . . . [They] carefully examine the surrounding circumstances, prior negotiations, and all other relevant incidents bearing on the intent of the parties. . . . Only [then] . . . will the court conclude that the

13

language in any given case is 'clear and unambiguous.'" *Id.* (quoting 4 Williston on Contracts § 600A (3d ed. 1961)).

It appears that evidence of "surrounding circumstances" is evidence of what the parties knew, which is a permissible consideration. But "extrinsic evidence" is the parties' statements of their intent, which is not a permissible consideration. In other words, the contract is the only statement of intent that a court may consider. This reading of *Sun Oil Co.* is consistent with other decisions noting that courts may consider industry custom, which is a fact known to the parties, when determining whether a contract is ambiguous. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n*, 208 F.3d 475, 486 (5th Cir. 2000) (dictum) (noting that provision requiring undefined terms to be interpreted in accordance with contemporary usage "tracks well-established rules of contract interpretation"; citing *Intratex Gas Co. v. Puckett*, 886 S.W.2d 274, 278 (Tex. App. 8th 1994); *KMI Cont'l Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex. App. 1st 1987)); *Toren v. Braniff, Inc.*, 893 F.2d 763, 765 (5th Cir. 1990) (dictum) (citing *Coker*, 650 S.W.2d at 393) ("In answering that question [whether the contract is ambiguous], the court should consider the intent of the parties as evidenced by the terms of the contract and industry custom."); *cf. GTE Sw., Inc. v. Pub. Util. Comm'n*, 102 S.W.3d 282, 297 (Tex. App. 3d 2003) ("[E]ven with unambiguous contracts courts may consider the commercial context of the transaction . . . [including] the ordinary terms, customs and usages then in effect as these are evidence of the intent of the parties.") (citations and quotation marks omitted). *But see David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) ("If a contract is unambiguous, the parol evidence rule precludes consideration of evidence of prior or contemporaneous agreements unless an exception to the parol evidence rule applies.") (citing *Hubacek v. Ennis State Bank*,

317 S.W.2d 30, 31 (1958)); *see also GTE Southwest*, 102 S.W.3d at 295 (referring to evidence of industry custom as "extrinsic evidence").[7]

Having established the factors the Court may consider, it remains to explain the question the Court is asking. The question is whether the contract is ambiguous. A contract is ambiguous if, in light of established rules of contract interpretation, there is more than one reasonable way to understand its terms. *Univ. Health Servs.*, 121 S.W.3d at 746 (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)). One rule of contract interpretation is particularly relevant in this case: "Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co.*, 164 S.W.3d at 662 (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

The Day Player Agreement unambiguously grants Cubicle the right to use images of Duffey's performance for commercial purposes in connection with *Office Space*. The agreement grants Cubicle "all rights throughout the universe in and/or to all results and proceeds of [Duffey's] services rendered hereunder." The agreement goes on to specify that this grant is

> including, but not limited to, the rights to . . . exploit, in any manner . . . whatsoever now known or hereafter devised in

---

[7] In *Turner Construction Co. v. Ace Property & Casualty Insurance Co.*, 429 F.3d 52, 55–56 (2d Cir. 2005), the Second Circuit applied Texas law to hold that an insurance contract was ambiguous, declining, over a dissenting opinion, to reference industry custom in order to resolve the ambiguity. This case is likely distinguishable because *Turner Construction* interpreted an insurance contract based on policy forms mandated by a state regulatory agency. Although *Turner Construction* did not specifically state that the contract at issue was based on such a form, the opinion cited *Progressive County Mutual Insurance Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003), which holds that "where the policy forms are mandated by a state regulatory agency, the actual intent of the parties is not material" and "when construing such policies, we look to determine the ordinary, everyday meaning of the words to the general public." This citation suggests that *Turner Construction* involved a government-mandated form. Industry custom is irrelevant to interpretation of such forms.

> perpetuity, any pictures, likeness or representations made hereunder, of [Duffey], including but not limited to his . . . poses, . . . performances and appearances . . . together with the right to use and display [Duffey's] . . . likeness for commercial . . . purposes in connection therewith.

The plain meaning of these words is that Duffey conveys the right to use images of his performance for commercial purposes in connection with his performance in *Office Space*. The sale of merchandise involves a commercial purpose connected to Duffey's performance in *Office Space*—merchandising falls within the plain meaning of "commercial purposes," and nothing in the remainder of the one-page agreement, or the schedule that it incorporates, suggests that "commercial purposes" should be read otherwise. Even if merchandising rights somehow fell outside the scope of "commercial purposes," they would be captured in the clause granting Cubicle "all rights throughout the universe" to the results of Duffey's performance. Duffey has not pleaded any circumstances surrounding the agreement's execution that would impact this analysis. These terms admit of only one reasonable interpretation: that Duffey granted Cubicle the right to use images of his performance on *Office Space* merchandise.

Duffey's arguments to the contrary fail. He argues that industry custom requires specific merchandising provisions to convey merchandising rights, but he fails to plead facts in support of any such custom. Instead, Duffey cites three cases in his opposition brief. Even if the facts discussed in these cases were alleged in the operative complaint, the facts would not be sufficient to establish the reasonableness of the interpretation that Duffey proposes. The brief cites one case discussing industry custom with regard to merchandising provisions and a performer's employment contract—James Dean's employment contract, employing Dean to star in multiple films, executed more than forty years before Duffey executed his contract in Texas. *Warner Bros., Inc. v. Curtis Mgmt. Grp., Inc.*, No. 94 Civ. 4016, 1995 WL 420043 (C.D. Cal. Mar. 31,

1993).  The brief also cites two other cases discussing contracts with specific merchandising provisions.

A custom is evidence of the parties' intent because it has "such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement."  Restatement (2d) of Contracts § 222(1) (1981); *see Nat'l Union Fire Ins. Co. v. CBI Inds., Inc.*, 907 S.W.2d 517, 521 n.6 (Tex. 1995) (quoting *id.*).  Evidence of customary practice in the 1950s plus two examples of the purported custom does not meet this standard.  In other words, even if Duffey alleged the facts set forth in his brief, such facts would not make it plausible that he and Cubicle had a justified expectation that their agreement excluded merchandising rights.  It is not reasonable to interpret the term "commercial purposes"—or, more importantly, the term "all rights throughout the universe"—as an expression of the parties' intent to convey rights for "commercial purposes except merchandising" or "all rights throughout the universe except merchandising rights."

Duffey also argues that a passage in the agreement between Fox and Running Press suggests that other *Office Space* performers had specific merchandising provisions in their agreements with Cubicle.  Perhaps Cubicle agreed that Jennifer Anniston could retain merchandising rights—but that has little bearing on whether Cubicle agreed that Duffey could retain merchandising rights.  At any rate, even if Duffey had made these allegations in the operative complaint, the Court would not be able to consider them.  Under Texas law, the Court cannot rely on extrinsic evidence to create an ambiguity in Duffey's Day Player Agreement.

Duffey argues for an interpretation of the Day Player Agreement that is unreasonable.  There is only one reasonable way to read the relevant terms:  Duffey granted Cubicle all rights to

images of his performance in *Office Space*, including the right to use his image on *Office Space* merchandise.

        **C.**        **Duffey's Legal Claims**

Each of Duffey's claims—false endorsement, breach of contract, and his claim for a declaratory judgment—fails in light of the Day Player Agreement. A plaintiff may assert a false endorsement claim only if the defendant is using his likeness without permission. *Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, No. 10 Civ. 2333 (KMW), 2013 WL 822173, *19 (S.D.N.Y. Mar. 6, 2013). Duffey granted Cubicle permission to use his likeness on *Office Space* merchandise; Cubicle sold that right to Fox, and Fox granted a license to Running Press. Duffey's false endorsement claim must be dismissed.

The elements of breach of contract are the existence of a contract, tendered performance by the plaintiff, breach of contract by the defendant, and resulting damages to the plaintiff. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009). When a contract is unambiguous and the facts of the parties' conduct are undisputed, breach of contract is a question of law. *Grohman*, 318 S.W.3d at 887 (citing *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971)). The Day Player Agreement is unambiguous, and the facts regarding sale of the Box of Flair are undisputed. Duffey granted Cubicle the right to use his image for commercial purposes in connection with his performance. Fox bought that right from Cubicle and sold it to Running Press. Running Press then used images of Duffey's performance on *Office Space* merchandise. Duffey has failed to allege that Fox or Running Press breached their contractual duties to him, and therefore, he has failed to state a claim for breach of contract.

Finally, a claim for declaratory relief requires a substantial controversy between the parties. *Kesselman v. The Rawlings Co., LLC*, 668 F. Supp. 2d 604, 610 (S.D.N.Y. 2009) (citing

*Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 594–95 (2d Cir. 1996)).  Because Duffey's other claims have been dismissed, there is not a substantial controversy between the parties in this case.  Duffey's claim for declaratory relief must be dismissed.

## III.     Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety. This action is dismissed.

SO ORDERED.

Date:   March 27, 2014
        New York, NY

_____
                J. PAUL OETKEN
             United States District Judge